In re Estate of Stanley McCormick.
Katharine Dexter McCormick, Appellant, v. The
People of the State of Illinois et al., Appellees.

Gen. No. 33,820.

Heard in the third division of this court for the first district at the October term, 1929. Opinion filed January 28, 1931.

BAKER, HOSTETLER & SIDLO and WINSTON, STRAWN & SHAW, for appellant.

TENNEY, HARDING, SHERMAN & ROGERS, for appellee Cyrus H. McCormick. MILLER, GORHAM & WALES, for appellee Harold F. McCormick. CASSELS, POTTER & BENTLEY and TOLMAN, SEXTON & CHANDLER, for appellee Anita McCormick Blaine; HORACE KENT TENNEY, AMOS C. MILLER, EDWIN H. CASSELS, HENRY P. CHANDLER and GEORGE C. BUNGE, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

On October 6, 1928, Katharine Dexter McCormick, the wife of Stanley McCormick, filed in the probate court of Cook county, a petition for the appointment of a conservator of the person and of the estate of her husband. Prior thereto, on October 4, 1928, there had been filed in the same court the petition of Cyrus H. McCormick and Harold F. McCormick, brothers of Stanley McCormick, for the appointment of a conservator of the estate of Stanley McCormick. Under proceedings had in the probate court, these applications

were heard together and the court granted so much of both petitions as prayed for the appointment of conservators of the estate, but by its order denied the application of Mrs. McCormick for the appointment of a conservator of the person of Stanley McCormick upon the sole ground that the court held itself to have no jurisdiction to make such appointment upon the service had in the case. Upon appeal to the circuit court this order was affirmed on the same ground.

From the undisputed facts it appears that Stanley McCormick was born in Chicago, Cook county, Illinois, grew to manhood in this city, and has since continuously preserved unchanged by any act of his, his domicile of origin in this State; that he is the son of Cyrus McCormick, deceased, and the brother of Cyrus H. McCormick, Harold F. McCormick, Anita McCormick Blaine, and Mary Virginia McCormick, who is also an incompetent person; that in 1904 he married Katharine Dexter, the appellant, and they made their home in Chicago; that in 1906, while they were temporarily in Massachusetts, Stanley McCormick became insane and has so remained continuously since that time; that for about two years, by agreement of the family, he was kept in various hospitals and private homes in Massachusetts, but in 1908, by consent of the members of the family, was removed to California, the climate there being considered more favorable to his recovery; that in 1909, after the application by his wife, and with the consent of all members of the family, the superior court of Santa Barbara county, California, acting under a statute which allowed the appointment of a guardian for a nonresident incompetent who was temporarily within the State, found that Stanley McCormick was a nonresident of California, that he was incompetent and appointed his wife, Dr. Henry B. Favill and Cyrus Bentley, all of Chicago, as guardians of the person of

Stanley McCormick; that upon the death of Dr. Favill in 1916, Mrs. Anita McCormick Blaine was substituted in his place and in 1927, upon the resignation of Cyrus Bentley, Harold F. McCormick was appointed to succeed him; that during the entire period from 1909 until the present, Stanley McCormick has lived on a private estate in the vicinity of Santa Barbara under the care of a resident physician, nurses and other employees, supervised by various specialists in nervous and mental diseases.

Upon the filing of the aforementioned petitions in the probate court, affidavits for service by publication were filed by the respective petitioners; that of Cyrus H. and Harold F. McCormick alleging that Stanley McCormick resided out of the State so that process could not be served upon him, and that his place of residence is in Santa Barbara, California; and that of Katharine Dexter McCormick, also alleging his absence from the State, but adding that he is still a legal resident of Cook county, Illinois, although his present "place of residence" is Riven Rock, Montecito, Santa Barbara, California. Publication in the Chicago Daily Law Bulletin, a secular newspaper published in Cook county, Illinois, was had for four successive weeks upon both petitions, giving notice of the pendency of such petitions, copies of the publication notices were mailed to Stanley McCormick at Santa Barbara, California, and certificates of mailing filed by the clerk of the probate court. It is conceded that this service by publication and mailing was in strict compliance with the provisions of the Illinois Chancery Act, sections 12 and 13, Cahill's St. ch. 22, ¶¶ 12 and 13.

Answers, averring in substance that Stanley McCormick has continuously resided and been living in California since the appointment of guardians of his person in 1909, under the jurisdiction of the superior court of Santa Barbara county, and objections to the

appointment of a conservator of his person, were filed by Cyrus and Harold F. McCormick and Anita McCormick Blaine.

At the hearing in the probate court on December 5, 1928, a jury was impaneled and found upon the evidence that Stanley McCormick was an incompetent person, and that he had real and personal property located in Cook county. Acting simultaneously upon both petitions, the court made the following findings:

1. That the legal residence and domicile of Stanley McCormick are and have been since the time of his birth in Cook county in the State of Illinois;

2. That the said Stanley McCormick is now and since the autumn of 1908 has been physically in Santa Barbara, California, and that said Stanley McCormick is now and since 1908 has been continuously without the State of Illinois, and has been of unsound mind during all of said period;

3. That said Stanley McCormick has real and personal property within Cook county in the State of Illinois, and also property outside of the State of Illinois;

4. While the court is of the opinion that it would be to the best interests of Stanley McCormick to have this court, being the court of his domicile, have charge of his person as well as his property, yet as the court holds that it has no jurisdiction over his person upon the service had in this case, the appointment of conservators of his person is denied on that ground;

5. That Stanley McCormick was not personally served with process within the State of Illinois, and therefore this court has no jurisdiction to appoint a conservator of the person of said Stanley McCormick.

The court thereupon proceeded to appoint conservators of the property of Stanley McCormick within the State of Illinois, but refused to appoint a conservator of his person.

Upon appeal to the circuit court of Cook county, the case was heard *de novo* as provided by statute. Katha-

rine Dexter McCormick amended her petition by further alleging that at the time when her original petition was filed and ever since, she has been a duly registered voter in and a citizen of Cook county, in the State of Illinois. Upon motions to quash the service, made by Cyrus and Harold F. McCormick and Anita McCormick Blaine, and proof and offers of proof made by Katharine Dexter McCormick under her petition as amended, the circuit court likewise held that upon the service in the case, no jurisdiction existed for the appointment of a conservator of the person, and accordingly dismissed appellant's petition, from which order this appeal is prosecuted.

The sole question here presented for decision is whether, under the foregoing facts and circumstances, the courts of Illinois have jurisdiction, upon service by publication and mailing, to appoint a conservator of the person of Stanley McCormick.

With regard to this issue both the probate and circuit courts adopted the views of appellees and held that an application for the appointment of a conservator of the person is an action *in personam,* and that the court is without jurisdiction to make the appointment unless the alleged incompetent is actually within the State and is served either by personal service or by that method prescribed in the Chancery Act, commonly known as residence service.

It is urged by appellant, however, (1) that the appointment of a conservator of the person of an incompetent who is a domiciled resident of the State is an action *in rem* to determine his status as a citizen in relation to the State and that the court acquires jurisdiction of his person, even though he be absent from the State, by constructive or substituted service as provided by statute; and (2) that whether the action be designated as *in rem* or *in personam,* nevertheless, the State owes to its citizen the obligation of protection which is reciprocal to his obligation of loyalty and that

the statutes of Illinois provide a mode of constructive or substituted service which empowers the court to extend to a citizen, who becomes incompetent while absent from the State, the protection which it owes him as *parens patriae*.

Appellees contend (1) that the appointment of a conservator of the person is an action *in personam* and that such appointment upon the service had in this case would be in violation of due process of law granted by section 2 of Article II of the Constitution of the State of Illinois and by the 14th amendment of the Constitution of the United States; and (2) that such appointment by a court in Illinois would also be in violation of the respect due to the California court which has appointed guardians of the person of Stanley McCormick and through such guardians is exercising custody and directing the care of the ward within its jurisdiction, and would constitute a denial of the full faith and credit due to the judicial process of the State of California under section 1 of Article IV of the Constitution of the United States.

In considering the question whether this is a proceeding *in personam* or *in rem,* the further inquiry as to whether domicile, residence, or citizenship are jurisdictional factors or possess any jurisdictional significance becomes extremely important. It should, therefore, be stated at the outset that whatever doubt may have existed as to the domicile and residence of Stanley McCormick by reason of his removal to California, without the exercise of any volition on his part, and his continued absence from Illinois for more than 20 years, is effectually disposed of by the finding of the probate court that his "legal residence and domicile are and have been since the time of his birth, in Cook county in the State of Illinois," and of the California court that he is a nonresident of that State. Moreover, it is the established law in this State, as well as in

other jurisdictions, that the physical removal of an incompetent adult from place to place does not affect his domicile, residence or citizenship. (*Town of Freeport v. Board of Supervisors*, 41 Ill. 495; *Clark v. Robinson*, 88 Ill. 498; *County of Franklin v. County of Henry*, 26 Ill. App. 193; *Lamar v. Micou*, 112 U. S. 452.)

Reasoning by analogy that the appointment of a personal conservator is similar to a probation order or a criminal conviction in that its only purpose or effect is to place a restraint upon the incompetent, appellees urge that it is a judgment *in personam* and they cite numerous cases to support their contention. We have read and carefully examined these decisions. *Raher v. Raher*, 150 Iowa 511, and *De La Montanya v. De La Montanya*, 112 Cal. 101, are in point and because of their importance will be discussed later. In *Jessup v. Jessup*, 7 Ind. App. 573, which was an appeal from a judgment appointing conservators for an insane person, the court characterized the proceeding "as of an *ex parte* character, but strictly adversary," reversing the judgment because no notice was served on the incompetent person. In none of the other cases, however, do we find any expression by the courts from which it can be held that a proceeding such as this is one *in personam*. Several of the citations were appeals from orders appointing guardians or conservators of the persons and estates of incompetents, and reversed because no service or notice whatsoever was had on the supposed incompetent. *Chase v. Hathaway*, 14 Mass. 222; *Eddy v. People*, 15 Ill. 386; *Hunt v. Searcy*, 167 Mo. 158; *Jessup v. Jessup*, 7 Ind. App. 573. These cases, however, are authority only for the proposition that some sort of service or notice is necessary in such proceedings, for, as was stated in *Chase v. Hathaway*, which preceded the adoption of the 14th amendment to the Constitution, "it is the privilege of

the party who is the object of the lunacy to be notified in some manner.''

Text writers, as well as courts, have experienced some difficulty in formulating all inclusive definitions of a proceeding *in rem*. Freeman, in his treatise on judgments, speaks of them as a class that is very well understood but difficult to describe. We are not concerned with the more common form of such proceeding wherein the court acquires jurisdiction by seizure of the *res* and enters judgment pursuant to some prescribed form of service or notice. The purpose and effect of the instant proceeding as will presently appear is rather to determine the *status* and capacity of a domiciled citizen, and the important inquiry is whether the power of the court to determine his status depends upon jurisdiction of his person or upon his domicile or residence.

*Pennoyer v. Neff,* 95 U. S. 714, is the leading case in this country establishing the proposition that process from the tribunals of one State cannot run into another State in a proceeding *in personam* and require a party there domiciled to respond to proceedings against him, but the court's opinion carefully excepted those cases where the capacity or status of one of its domiciled citizens was before the court, and in recognition of this principle said:

''To prevent any misapplication of the views expressed in this opinion, it is proper to observe that we do not mean to assert, by anything we have said, that a State may not authorize proceedings to determine the *status* of one of its citizens towards a non-resident, which would be binding within the State, though made without service of process or personal notice to the non-resident. The jurisdiction which every State possesses to determine the civil *status* and capacities of all its inhabitants involves authority to prescribe the conditions on which proceedings affecting them may be

commenced and carried on within its territory. The State, for example, has absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved.''

*Van Matre v. Sankey,* 148 Ill. 536, presents an expression of the Supreme Court of this State upon the significance of domicile as a jurisdictional factor in determining the status of one living outside the State. The question raised by the appeal was whether there was a legal adoption of Caroline Sankey by Samuel Sankey, in his lifetime, in Pennsylvania. If the proceedings were valid she was entitled to the entire estate. The facts are sufficiently stated in the opinion from which we quote at length:

"It is urged that the court of common pleas of Lycoming County, Pennsylvania, was without jurisdiction, and its decree is void, for the reason, first, that the child adopted was in Illinois, and out of the jurisdiction of that court; and second, that it is not shown that there was notice to the child proposed to be adopted. . . . Caroline C. Sankey, at the date of the adoption, was of about the age of nine years. She was born in Lycoming County, Pennsylvania, where her father and mother were domiciled, and which was also the domicile of her parents, severally, at the time of their decease. There is substantial uniformity of decision that an infant cannot, of its own volition, change its domicile. . . . The statute of Pennsylvania does not require that the child shall be personally present in court, or that it be notified of the proceeding. Notice to it would in no wise add to or detract from the power given or the duty imposed by law upon the court of determining the question of adoption in the interest and for the welfare of the child. It could neither consent nor object to the power exercised by the State, through the instrumentality of the court, over its per-

son. The power and duty of the State to care for the estates and persons of infants, so far as necessary for their protection and education, have been generally recognized. It is, in cases of this sort, of the same character of jurisdiction over them as that exercised by courts of chancery, which is an exercise of the prerogative of the sovereign, springing from its power and duty, as *parens patriae,* to guard the interests of dependents, and protect and control them. . . . The proceeding in this case was in the nature of a proceeding *in rem,* the purpose being to change the status of the child, in her relation to said Samuel Sankey. The decree of adoption was a declaration by competent authority, operative to change her status and, *ipso facto,* to render her that which she was declared to be,—the heir-at-law of Samuel Sankey,—and capable of inheriting from him, in all respects, as if she had been his child born in lawful wedlock. . . . The status of appellee having been established under and existing by virtue of the *lex domicilii,* is to be recognized and upheld in every other State, unless such status, or the rights flowing therefrom, are inconsistent with or opposed to the laws and policy of the State where it is sought to be availed of. This court, in *Keagan v. Geraghty,* 101 Ill. 26, quoted with approval the language of Mr. Justice Gray, in *Ross v. Ross,* 129 Mass. 243, as follows: 'It is a general principle that the status or condition of a person, the relation in which he stands to another person, and by which he is qualified or made capable to take certain rights in that other's property, is fixed by the law of the domicile, and this status and capacity are to be recognized and upheld in every other State, so far as they are not inconsistent with its own laws and policy.' ''

Appellees seek to distinguish this case by pointing out that in a proceeding for the adoption of a child, notice to the child is unnecessary, and they cite *In the*

*Appeal of Gibson,* 154 Mass. 378, wherein the Massachusetts court, relying on *Chase v. Hathaway, supra,* recognizes the principle that notice to a minor under the age of 14 years is not essential, but is indispensable as against an insane person. The rule as stated by appellees is conceded to be correct, but in pointing out the distinction, the foundation of the court's opinion in the *Sankey* case is entirely overlooked. Caroline Sankey was absent from the State but domiciled there, and the force of the opinion as applicable to the instant case is the court's finding that the proceeding in adoption was one to determine her status, and was, therefore, a proceeding *in rem* and that personal jurisdiction over her was not necessary.

The principle thus enunciated in the two foregoing cases is likewise supported by the text writers, for Minor on Conflict of Laws, section 69, contains the following:

"Chapter V, Status of Personal Capacity. § 69. Capacity in General—Several Sorts of Capacity—In general, the capacity or incapacity of a person to take part in a particular transaction is not an *active* but a *passive* element of the transaction, one imposed by law, and independent of the will of the parties.

"Theoretically therefore, upon principles just examined, the proper law governing the capacity or incapacity of the person is the law of the person's legal situs or domicil (*lex domicilii*), not the law of his actual situs. And in general, as we shall see, this is the rule."

And 2 Freeman on judgments, 5th Ed. section 900, says:

"Any proceeding which is designed or the primary purpose of which is to establish status is to that extent a proceeding *in rem* and the judgment or decree, if upon the merits, is as conclusive as any other judgment *in rem.*"

In addition to the foregoing authority, appellant calls the court's attention to the Restatement of the law of Conflict of laws, prepared by the American Law Institute (Proposed Final Draft No. 1), assembled by a group of eminent scholars headed by Professor Joseph H. Beale of Harvard Law School. The treatise submitted for our consideration deals at some length with the matter of status and contains the following excerpts cited by appellant:

"Section 60. A State has jurisdiction over the status of persons domiciled within the State."

"Section 124. A State can exercise through its courts jurisdiction to create the status of guardian of the persons only if the domicil of the person placed under guardianship is within the State."

"Section 152. The status of guardians and ward is created by the State of the domicil of the word. Comments:

"a. The guardianship here meant is guardianship of the person, and is to be distinguished from guardianship or custody of property.

"b. The ward may be either a minor, or an insane person or other defective."

Aside from the *Raher* and *De La Montanya* cases, decided in Iowa and California, respectively, and decisions in these states approving the doctrines there enunciated, we find no authority in appellee's brief, nor in any that we have been able to find, presented upon pertinent facts, to contradict the foregoing authorities. Appellees do contend that domicile is not to be considered as a jurisdictional factor in determining the status of Stanley McCormick, but their argument upon this point rests on the assumption that this is a proceeding *in personam*, which is the very question to be determined. They also question the fact, which we regard as definitely ascertained, that Stanley McCormick is domiciled in Illinois. They state in their brief that:

"It will serve no useful purpose to discuss the meaning of the word 'domicile' as used in the cases. It is sufficient to point out that the kind of domicile which appellant says Stanley McCormick has retained in Illinois, despite his prolonged actual residence elsewhere, bears no relation at all to his actual home or residence."

We do not subscribe to this view for the reasons stated elsewhere in this opinion, namely, that the findings of the probate court definitely establish both the residence and domicile of the incompetent in Illinois and, as clearly expressed in the decisions heretofore cited, his domicile and residence having clearly been established in this State before he became incompetent, cannot be affected by his subsequent physical removal to California. We are therefore of the opinion that the jurisdiction of the probate court to determine or affect the status of Stanley McCormick is dependent upon his domicile, rather than personal jurisdiction over him, and this logically leads to the second inquiry necessary for determining whether this proceeding is *in rem* or *in personam,* namely: Is a proceeding to declare a domiciled citizen insane and appoint a conservator of his person and estate, a proceeding to determine a *status?*

The courts of numerous States have passed upon this question in proceedings for the appointment of conservators or guardians of the persons and estates of incompetents. In *Leonard v. Leonard,* 14 Pick. (Mass.) 280, the guardian for a person *non compos mentis* sued upon a promissory note and the defendant offered to prove that he had paid the note to the ward after the appointment of the guardian. The offer of proof was rejected, and the court said:

"In general, the judgment of a court of competent jurisdiction is conclusive against the parties; and judgments *in rem* are conclusive against all the world; for instance, decrees in admiralty cases, and in relation to

marriage and divorce, the probate of wills, etc. The
question, then, is, whether the appointment of a guard-
ian is of this nature. It is suggested on the part of the
defendant, that an inquisition of lunacy in England, is
not conclusive on the question of sanity; but it is a
sufficient answer, that such an inquisition is very dif-
ferent from the proceedings in a court of probate
under our statute.''

The distinction which the Massachusetts court makes
between an inquisition of lunacy in England and pro-
ceedings for the appointment of conservators is per-
tinent to the contention of appellees that the restraint
placed upon an incompetent, tending to deprive him
of his liberty, is like a criminal conviction and there-
fore an action *in personam*. We believe that it was
the intendment of the legislature of Illinois to estab-
lish a like distinction by enacting two separate statutes
exercising jurisdiction over lunatics. Chapter 85 is
designed primarily toward placing a restraint on in-
sane persons by commitment to asylums or State
hospitals and requires that the object of the inquisi-
tion be brought before the court unless it appears by
affidavit that his presence would be manifestly im-
proper, and where the person is not produced in court
the statute requires the court to direct the manner of
notice that shall be served. This statute is analogous
to the inquisition of lunacy in England referred to in
the *Leonard* case. Chapter 86, however, has a different
intendment; it deals with the civil status of incom-
petents, their persons and estates. It provides for
''the appointment of a conservator of the person or
estate (or both)'' and prescribes service in the same
manner ''by summons or otherwise'' as in chancery
proceedings. The contents of this chapter indicate the
treatment of the subject matter therein as of a purely
civil nature, rather than criminal, and lend support to
the distinction made by the Massachusetts court and

the contentions of appellant herein. This distinction is expressly recognized in *Joost v. Racher,* 148 Ill. App. 548.

In *Shroyer v. Richmond,* 16 Ohio St. 455, suit was brought against the sureties on a guardian's bond, which the sureties defended on the ground that the guardian was not properly appointed. One of the reasons assigned was that the ward was not before the court. Judgment was rendered against the sureties, the court saying:

''Proceedings for the appointment of guardians, are not *inter partes,* or adversary in their character. They are properly proceedings *in rem;* they are instituted, ordinarily, by application made on behalf of the ward, and for his benefit; and the order of appointment binds all the world. In such a proceeding, plenary and exclusive jurisdiction of the subject-matter, has been conferred by statute on the probate court, and that jurisdiction attaches, whenever application is duly made to the court for its exercise in a given case. It is not essential to the jurisdiction, that the ward be actually before the court, unless, by reason of his right to choose a guardian, or for other cause, the statute so require. And when jurisdiction has attached, the court has full power to hear and determine all questions which arise in the case, whether in regard to the status of the ward or otherwise; and no irregularity in the proceedings, or mistake of law in the decision of the questions arising in the case, will render the order of appointment void, or subject it to impeachment collaterally.''

In *Southern Tier Masonic Relief Ass'n v. Laudenbach,* 5 N. Y. S. 901, action was brought on a fraternal insurance policy and the question arose whether the insured could designate a new beneficiary after having been adjudged insane. The facts, briefly stated, disclose that the insured had been domiciled in Rochester,

N. Y. He secretly left home, went to Chicago and never returned. Several months after his departure, his wife, who did not know his whereabouts, prayed for the appointment of a commission to determine his mental condition. Commissioners appointed found him to have been insane when he left home. Several years later the insured designated a new beneficiary. The old beneficiary relied upon the insanity inquisition and the new one claimed that there was no jurisdiction because the insured had not been notified. The court said:

"The next objection is that there was no notice to Laudenbach of the execution of the commission. Whether or not notice shall be required in proceedings *in rem* depends upon the statute. No question of constitutional power is involved. . . . There was no statutory provisions regulating proceedings *de lunatico* until 1874, and these provisions have been substantially incorporated into the Code of Civil Procedure. Before that, while it was usual to give the alleged lunatic notice of the execution of the commission, it was for the court to say whether notice should be dispensed with. *Re Tracy,* 1 Paige, 580. That is the rule now by statute. Code Civil Proc. Sec. 2325. Before the Code, as now, giving of notice was discretionary and neglect to give it is simple irregularity, which does not avoid the proceedings. . . .

"There has never been any wavering in the courts of any country in holding that such proceedings were *in rem,* and that they were conclusive evidence of insanity, as to all contracts of his positive agreements made after the inquisition. *Banker v. Banker,* 63 N. Y. 409."

The validity of a deed which was executed after the grantor had been committed to an insane asylum was invoked in *Leggate v. Clark,* 111 Mass. 308. The trial court admitted the order of the probate court committing the grantor to the insane asylum as prima facie

evidence of his incompetency. The Supreme Court held this to be error and in its opinion, based upon *Leonard v. Leonard, supra,* distinguished between statutory provisions for the commitment of persons to insane asylums or hospitals (such as chap. 85, Cahill's Ill. Rev. St.) on the one hand and provisions for the appointment of a guardian and fixing the status of the person (such as chap. 86, Cahill's Ill. Rev. St.) on the other, and said:

"But an inquisition of lunacy under the English system, and proceedings under our system to appoint a guardian of an insane person, are in the nature of proceedings *in rem,* and are designed to fix the *status* of the person proceeded against. Under our system careful provision is made for notice to the alleged insane person, and for a full hearing, and the decree fixes the *status* of the ward as an insane person 'incapable of taking care of himself.' The statutes give the care and management of his person and estate to the guardian and take from him the capacity to make contracts or to transfer his property. The necessary effect of the decree is that the ward is in law, what the decree declares him to be, incapable of taking care of himself, as to all the world."

The following quotation from the case of *Bruce v. Bruce,* 263 Fed. 36, states sufficient facts for an understanding of the case:

"The plaintiff was adjudged to be insane by the judge of the county court of Santa Rosa county, Florida, in a statutory proceeding, and was confined by an order of the court in an asylum as a person of unsound mind. A guardian was appointed for his person and estate thereafter by the same court. The plaintiff was afterwards declared to be improved and harmless, and was released from the asylum. He thereupon instituted this suit. The bill fails to aver any such irregularities in the proceedings adjudging

the plaintiff to be insane, and committing him to the asylum, and appointing a guardian for his person and estate, as would justify an attack in a collateral proceeding, such as this is. The proceedings were *in rem,* and no notice thereof to the lunatic was required or possible. The bill does not charge that the plaintiff was sane, when adjudged insane and committed; nor does it charge that the proceedings in lunacy were instituted with a design to defraud the plaintiff of his property."

Support of this principle is also found in Freeman on Judgments, Vol. 2, 5th Ed. Sec. 902, wherein it is stated:

"Where the purpose of an insanity proceeding is to affect the status of the person in question, or, in other words, his legal relation to the rest of the world, whether in respect of his liberty or his personal and property rights, it is obviously in the nature of a proceeding *in rem* to that extent, and any resulting judgment is undoubtedly binding upon the world as to the status thus adjudicated. . . . But, as already indicated, most courts regard an inquisition or similar statutory proceeding for the appointment of a guardian for the person and property of a lunatic or mentally incompetent person as a proceeding *(in) rem* designed to determine the legal capacity of the alleged incompetent to make contracts and to manage and dispose of his estate. Consequently the appointment of a guardian determines his status in this respect as against the whole world and is ordinarily conclusive until the guardianship has been terminated."

Two cases, *De La Montanya v. De La Montanya,* 112 Cal. 101, and *Raher v. Raher,* 150 Iowa 511, are chiefly relied on by appellees for their contention that this is a proceeding *in personam.* Both of these cases were decided by divided courts. Subsequent decisions in these States followed the majority opinions, but aside from

California and Iowa we find no jurisdiction so holding upon facts pertinent to this case.

The *De La Montanya* case was an action to obtain a divorce, in which the plaintiff also asked for the custody and control of two children, the issue of the marriage, and for permanent alimony and suit money. The defendant was served by publication, which for the purposes of the case was held to be in compliance with the statute, but he did not appear in the action. The facts disclosed that defendant was born and, during his whole life, lived in California. He left the State on the 20th of November, 1893, with the two children and proceeded to Paris, France, where on January 4, 1894, he made application to the ministry of justice for express permission to be domiciled in France. Such permission was granted in July, 1894. The suit was commenced two days after his departure from California. The court entered a decree for divorce, custody of the children and the payment of alimony. Upon defendant's motion to vacate the decree, except as to the divorce of the parties, the question presented was whether the court had jurisdiction to award custody of the children and alimony. The majority opinion held that it did not, relying chiefly on *Pennoyer v. Neff, supra,* and the doctrine contended for by appellees, namely, that the proceeding in so far as it related to the control of the minor children, alimony and suit money, was an action *in personam,* over which the court could not acquire jurisdiction by constructive service.

The dissenting judges, however, based their opinion on the broad doctrine, supported by authorities cited therein, that "the laws of a sovereign are binding upon all citizens domiciled within its borders, whether temporarily absent or not." They limited the application of *Pennoyer v. Neff* to the doctrine that a judgment *in personam,* rendered in a State court against a non-

resident, upon constructive or substituted service, cannot be enforced even in the State where it was rendered, and pointed out that portion of *Pennoyer v. Neff* wherein the court recognized the principle that a State may authorize proceedings to determine the *status* of one of its citizens and that the jurisdiction which it thus possesses to determine civil status and capacities involves authority to prescribe conditions on which proceedings affecting them may be commenced and carried on within its boundaries. The minority opinion, holding the action to be *in rem,* points out that such judgments are not confined to adjudications against things, but have application to matters involving status, such as marriage, divorce and custody of children, and that in an action brought for both divorce and custody of the children, the latter is an incident to the former and "the court has jurisdiction over the status founded on the relation of parent and child, as well as of the status founded on the relation of husband and wife, even as against a *bona fide* nonresident domiciled elsewhere. And in such a case the actual physical presence of the children is no more necessary for jurisdiction over the status in the one instance than is the presence of the husband necessary in the other.''

*Raher v. Raher,* decided by a court divided three to two, involved the validity of the appointment of a guardian for an incompetent person. The incompetent was domiciled in Iowa but was temporarily in South Dakota at the time when service was made by delivering a summons to him. This manner of service was provided by the statute. The majority opinion held the proceeding to be *in personam,* and that "a State cannot, by providing for personal service outside of its territorial limits, authorize its courts to render personal judgment against a defendant thus served.'' The judgment was held to be void, upon the

service had, as being in violation of the constitutional provision with reference to due process of law. The court based its conclusion on the finding that the action is one *in personam* and they relied chiefly on *Pennoyer v. Neff*. It is conceded in the opinion, however, "that we have found no case in which it has been specifically held, under pertinent facts, that a personal judgment against a resident, who is actually served with notice outside of the territorial limits of the State, is void."

The dissenting opinion held domicile to be a significant factor to determine the court's jurisdiction where the mode of service provided by statute was reasonably certain of notifying the incompetent of the pendency of the proceeding. The theory of the minority judges is best expressed by the following language quoted from their opinion:

"My doubts of the correctness of the majority opinion first arose when I called to mind the rule everywhere prevailing that the State has plenary power to prescribe how its citizens and residents shall be brought into its courts. It may undoubtedly provide for posting of notices, notice by registered letter, notice by publication, or other form of constructive service upon residents of the jurisdiction. It may also provide for substituted service upon both residents and nonresidents; and as to residents, such service is good, although the person to whom the notice is addressed may be temporarily absent from the State. The reason for this is that every subject or citizen of a country where legal proceedings are instituted owes allegiance to his country and submission to its laws. He impliedly consents to be bound by its laws so long as he remains a citizen and resident, and when the State enacts a statute with reference to procedure, every citizen, of necessity, consents thereto, and no matter where he may be does not change that assent until he renounces his former allegiance and in fact

becomes a nonresident. These principles are, I think, fundamental.''

The majority opinions in both the *Raher* and *De La Montanya* cases are based on the finding that the proceedings before the court were strictly *in personam*. We cannot subscribe to this view. We regard the weight of authority as being fully in accord with the doctrine that the purpose of a proceeding such as this is to determine the civil status of one of its domiciled citizens. The *Sankey* case, as we understand it, proceeds upon that theory, *Pennoyer v. Neff* expressly recognizes the principle and the other authorities cited sustain it. The dissenting opinions in the Iowa and California cases are founded on this doctrine and represent the greater weight of authority. We accordingly have no hesitation in reaching the conclusion that this is a proceeding *in rem* to determine the civil status of Stanley McCormick, instituted in the State of his domicile, and that the court has jurisdiction upon the service prescribed by the Chancery Act to appoint conservators of his person as well as his estate under chapter 86 of the statute.

It is further urged, however, that regardless of whether this is a proceeding *in rem* or *in personam*, the probate court has jurisdiction under the statute, upon the service had, to make the appointment. Before discussing the authorities applicable to this question, we shall proceed to a consideration of chapter 86, Cahill's Illinois Revised Statutes, under which these proceedings were brought. This statute has been amended from time to time since its enactment in 1874. Before the amendment of 1919 the court's jurisdiction was confined to the appointment of conservators of persons who resided within the county where the proceeding was instituted. It was so held in *Laird v. Dickinson*, 241 Ill. 380. In 1919 the scope of the jurisdiction was extended by adding to section 1 the

following provision: "or if such person resides out of this State and has an estate within this State, then, the County Court of the county where his real estate or a part thereof may lie, or if such non-resident has no real estate in this State then the County Court of the county where he may have personal property, shall, on the proper petition of any reputable citizen of such county, for the appointment of a conservator of the person or estate (or both) of such person."

At the same time the legislature also amended the procedure required under section 2 by adding to that part of the section which theretofore provided that, "summons shall be issued returnable on any day of the term, and service thereof shall be had upon the person for whom a conservator is sought to be appointed, in the same manner by summons or otherwise as service is had in chancery," the following language: "excepting that where personal service of such summons is had, such service shall be had at least three days before the return day of such summons."

Having thus extended the provisions of the statute to persons residing out of the State but having property within the State and including in the relief provided for such persons "the appointment of a conservator of the person or estate (or both)," it would seem to have been clearly contemplated by the legislature when it also amended the procedural requirement, "excepting that where personal service of such summons is had, such service shall be at least three days before the return day of such summons," that in some cases there would be personal service and in others constructive service as prescribed in the Chancery Act. The Supreme Court of this State in *Nelson v. Chicago, B. & Q. R. Co.,* 225 Ill. 197, recognizes only two kinds of service, personal and constructive, and therefore constructive service must have been contemplated by the legislature where personal service could

not be had. Manifestly, if this was the intention of the legislature, the court acquired jurisdiction to make the appointment unless it should be held that section 2 is in violation of the due process clause of the constitution in so far as it provides for constructive service.

This leads to the inquiry whether the legislature may provide for a manner of constructive service as to its domiciled citizens, absent from the State, without depriving them of the due process of law guaranteed by the State and federal constitutions. We are of the opinion that it may and for the following reasons: Under our form of government, the States of the United States together constitute a nation, but in their domestic matters they are *quasi* sovereigns. As such, the citizen owes allegiance to his State and submission to its laws and as Mr. Justice Deemer pointed out in the *Raher* case, "impliedly consents to be bound by its laws so long as he remains a citizen, and when the State enacts a statute with reference to procedure by which its citizens shall be made amenable to the jurisdiction of its courts, every citizen, of necessity, consents thereto and his absence from the State does not change that assent until he renounces his former allegiance and in fact becomes a non-resident."

Freeman in the fourth edition of his work on Judgments, Vol. 2, section 570, states the rule in the following language:

"In relation to the extraterritorial effect of a judgment procured against a person in the state of his domicile, in an action in which he entered no appearance, and in which the process was served constructively, in accordance with the laws of that state, radical and irreconcilable differences of opinion exist. In one case the court said: 'We will treat the judgment, not as void, nor as conclusive, but simply as prima facie.' This is a kind of middle ground, or compromise treatment of the question; and, like most compromises, is

probably less defensible, upon principle, than either of the extremes between which it is placed. The position, however, which seems to be the best sustained, both by reason and by precedents, is, that each state has the authority to provide the means by which its own citizens may be brought before its courts; that the courts of other states have no authority to disregard the means thus provided; and finally, that every judgment or decree obtained in a state against some of its citizens, by virtue of a lawful, though constructive, service of process, should be as obligatory upon such citizen in every other state as it is in the state whence it is taken. Nor is it destructive of the extraterritorial effect of a judgment based on constructive service that the defendant, being a citizen of the state, was temporarily absent therefrom. It is sufficient that he was, at the time, subject to the laws of the state and to the territorial authority of the court.''

Appellant again cites us to the Restatement of Conflict of Laws, heretofore referred to, in which this subject is treated. Section 48 states:

''A State has jurisdiction over a person

(a) If he is within the territory of the State;

(b) If he is domiciled in the State, although not present in the State; or

(c) If he has consented or subjected himself to the exercise of jurisdiction over him, either before or after the exercise of jurisdiction.''

And section 82 contains the following statements:

''The exercise of jurisdiction by a State through its courts over an individual may be based upon any one of the following facts:

(a) He is personally present within the State;

(b) He has his domicil within the State;

(c) He is a citizen or subject owing allegiance to the State;

(d) He has consented to the exercise of jurisdiction;

(e) He has by acts done or caused to be done by him within the State subjected himself to the jurisdiction.''

Under section 85 we find:

''A State can exercise through its courts jurisdiction over an individual domiciled within the State, although he is not present within the State. . . .

(b) A method of service of process upon a person domiciled within the State is valid if, but only if, it is one reasonably calculated to give him knowledge of the action and an opportunity to be heard.''

One of the illustrations cited under this section is as follows:

''A brings an action against B in a court of state X. B. is domiciled in X but is in state Y. In accordance with a statute, process is served upon B by mailing a summons to B at his address in Y. The court has jurisdiction over B.''

This example coincides precisely with the method of service which was followed in the case before us and is a recognition of the principle contended for, by a group of authorities whose findings are based on a careful collation of the decisions.

It is urged, however, that in order to justify the exercise of jurisdiction upon constructive service, two elements must coincide: *First,* the defendant or party to be served must be domiciled within the State and *second,* a method of service must be employed which is reasonably' calculated to give the defendant notice; and if either of these elements is lacking the court cannot exercise jurisdiction. A careful consideration of the cases cited by both sides of this controversy convinces us of the soundness of this doctrine, both upon principle and authority.

*Hess v. Pawloski,* 274 U. S. 352 and *Wuchter v. Pizzutti,* 276 U. S. 13, recently decided by the United States Supreme Court, involved the validity of the

Massachusetts and New Jersey statutes, both of which provided that the use of the State's highway by a nonresident motorist would constitute a designated State official as agent for such motorist to receive process in any action growing out of an accident or collision in which such nonresident should be involved.

The Massachusetts statute which required the State official to mail a copy of the process to defendant, was upheld. The New Jersey statute which did not require such communication was declared invalid as a violation of the Fourteenth Amendment. Mr. Justice Butler in the Massachusetts case said:

"Under the statute the implied consent is limited to proceedings growing out of accidents or collisions on a highway in which the nonresident may be involved. It is required that he shall actually receive and receipt for notice of the service and a copy of the process. And it contemplates such continuances as may be found necessary to give reasonable time and opportunity for defense. It makes no hostile discrimination against nonresidents but tends to put them on the same footing as residents. Literal and precise equality in respect of this matter is not attainable; it is not required. *Canadian Northern Ry. Co. v. Eggen*, 252 U. S. 553, 561–562. The State's power to regulate the use of its highways extends to their use by nonresidents as well as by residents. *Hendrick v. Maryland*, 235 U. S. 610, 622. And, in advance of the operation of a motor vehicle on its highway by a nonresident, the State may require him to appoint one of its officials as his agent on whom process may be served in proceedings growing out of such use. *Kane v. New Jersey*, 242 U. S. 160, 167. That case recognizes power of the State to exclude a nonresident until the formal appointment is made. And, having the power so to exclude, the State may declare that the use of the highway by the nonresident is the equivalent of the appointment of the registrar as agent on whom process

may be served. Cf. *Pennsylvania Fire Ins. Co. v. Gold Issue Mining Co., supra,* 96; *Lafayette Ins. Co. v. French,* 18 How. 404, 407–408. The difference between the formal and implied appointment is not substantial so far as concerns the application of the due process clause of the Fourteenth Amendment.''

In the New Jersey case, Mr. Chief Justice Taft, after reviewing the authorities, concluded by saying:

''These cases and others indicate a general trend of authority toward sustaining the validity of service of process, if the statutory provisions in themselves indicate that there is reasonable probability that if the statutes are complied with, the defendant will receive actual notice, and that is the principle that we think should apply here.''

These cases emphasize the necessary element of notice where constructive service is provided and also enunciate the principle that nonresidents may be required to impliedly consent to service of process, provided a reasonable method of notice or communication to them is prescribed. If this may be done as to a nonresident upon his implied consent, we fail to understand why a domiciled resident of the State does not, to even a greater degree, consent in advance that he may be reached by constructive service while absent from the State. His allegiance to the State, as one of its citizens, certainly implies a greater obligation to be bound by its laws than does a nonresident of the State whose presence in the State may have been but transitory in the most limited sense.

In *McDonald v. Mabee,* 243 U. S. 90, the defendant was domiciled in Texas, but had left the State permanently with the intention of establishing a domicile in Missouri. Service was had upon him by publication in a newspaper after his final departure from the State. The Supreme Court of Texas sustained the judgment, but the Supreme Court of the United States

reversed that decision upon the sole ground that publication in a local newspaper was not sufficient notice to bind a person who had left the State permanently, and said:

"But it appears to us that an advertisement in a local newspaper is not sufficient notice to bind a person who has left a State intending not to return. To dispense with personal service the substitute that is most likely to reach the defendant is the least that ought to be required if substantial justice is to be done." This case, as is pointed out in the commentaries of the American Law Institute (Commentaries on Conflict of Laws, Restatement No. 2, page 14), while sometimes cited for the proposition that a court cannot exercise jurisdiction over a person domiciled within the State, if he has left the State, merely holds that the element of proper notice was lacking to give the court jurisdiction. This, we believe, clearly appears from the last sentence of the above quotation. When the decision of the United States Supreme Court in *McDonald v. Mabee* was later cited to a Texas court in support of the proposition that constructive service upon a domiciled citizen did not give jurisdiction to render a personal judgment, the court emphatically repudiated the construction contended for (*Becker v. Becker* [Tex. Civ. App.], 218 S. W. 542.) A judgment for alimony and attorney's fees had been rendered against a domiciled Texas citizen, pursuant to service of a copy of the petition, while he was in Kansas City, Mo. The court said:

"At the time of the alleged service upon appellant he was a citizen of Texas, and the statutes of this State authorized the kind of service complained of. Our decisions uniformly support the validity of the personal judgment rendered upon such service upon citizens of Texas. The contention is prompted by expressions in the opinion of the federal Supreme Court

in the case. of *McDonald v. Mabee,* 243 U. S. 90.
. . . In that case it was held that service by pub-
lication upon a citizen of Texas, who had left the
State intending to make his home in another State, but
whose family was still residing in Texas, would not
support a personal judgment. The court did not hold
that when a citizen is absent from his State the courts
thereof are as powerless with respect to the rendition
of a personal judgment against him as if he resided in
another State. On the contrary, the language used is
rather persuasive to the effect that the court would
have upheld the service had it been such as is under
consideration in this case.''

The Supreme Court of Illinois early recognized the
doctrine of citizenship and allegiance to the State as a
basis of jurisdiction in the case of *Bimeler v. Dawson,*
5 Ill. 536, where an action had been brought in this
State upon a judgment obtained in Ohio. The defend-
ant had been served by leaving a copy at his residence,
not by personal service. Whether or not he was a
resident of Ohio was not clear. Plaintiff in the court
below had offered a certified copy of the Ohio judg-
ment showing residence service and the trial court en-
tered judgment for defendant. The judgment was re-
versed on writ of error, the court holding that the Ohio
judgment would be conclusive unless the defendant
could show that he was not a citizen of Ohio at the time
when the service was made. We have italicized por-
tions of the opinion to show their applicability to the
instant case:

''The laws of the several States provide different
modes of bringing parties into court. In some States,
personal service of process is required; while in other
States, that mode is not indispensable, but a party may
be required to appear and defend an action, on notice
by publication, or by the leaving of process at his resi-
dence. *It is doubtless competent for each State to*

*adopt its own regulations in this respect, which will be
binding and obligatory on its own citizens.* We cannot
doubt the right or power of the State of Ohio, to pro-
vide that the kind of service, which it appears was
made in this case, shall be sufficient to authorize its
courts to take jurisdiction of the person of a defend-
ant, and proceed to hear the case, and render judg-
ment. *A judgment thus rendered against one of its
citizens would be binding and conclusive on him, for
owing allegiance to the State, he is bound by its laws,
and amenable to its judicial tribunals.* That State,
however, cannot, in that way, get jurisdiction over the
people of other States. Its laws can only operate
within its own territory, and on its own citizens. They
cannot be made to operate extraterritorially, or on the
citizens of other States, unless they go voluntarily
within its limits.''

*Bickerdike v. Allen,* 157 Ill. 95, is stressed by appel-
lant as an expression of the Supreme Court of Illinois
that jurisdiction exists to render judgment *in per-
sonam* where domicile or residence of the defendant
and proper notice both exist. The action there was a
creditor's bill on a judgment obtained in 1873, which
had been revived in 1891. The defendant claimed that
the judgment of revival was improper because there
was no personal service upon him. The statute pro-
vided that in scire facias to revive a judgment notice
could be given to the defendant by publication and
mail ''as provided by statute for notice in like cases in
chancery,'' and service had been made in the proceed-
ing to revive the judgment by publication and mail in
compliance with section 12 of the Chancery Act. Rely-
ing on the authority of *Pennoyer v. Neff, supra,* the
court stated that this section of the statute would be
unconstitutional as applied to nonresidents since the
proceeding was one *in personam* and not *in rem,* and
the State of Illinois did not have power to summon the

citizens of other States by constructive service to render personal judgments against them. The court then proceeded to examine the requirements of section 12 of the Chancery Act to determine whether it provided a method of service which was proper as against a citizen of this State, and said:

"If the statute provided for bringing in a resident of the State by publication of the notice only without the mailing of any notice to him, the same objection might lie as in the case of a nonresident. A judgment *in personam* in the court of a State against one of its citizens who is not served with process, but is served by publication only, cannot be valid, except in cases coming within the exceptions already indicated (i.e. proceedings *in rem* or to determine a status). . . . But this statute does something more than require the publication of the notice; it requires a copy of the notice to be sent by mail, addressed to the defendant whose place of residence is stated in the affidavit. Suppose that a defendant resides in this State, and has a known residence here, but conceals himself so that process cannot be served upon him, and that the notice specified in the statute is sent to him by mail. If he receives the notice so sent, he has received personal notice just as much as though a summons was served upon him by the sheriff. The certificate of the clerk is made proof of the mailing of the notice. 'Proof of the mailing of notices, properly addressed, is *prima facie* evidence of their having been received by the party addressed.' (*Meyer v. Krohn*, 114 Ill. 574; *Young v. Clapp*, 147 Ill. 176.) When, therefore, in any collateral proceeding, a judgment of revival based upon notice, given through the mail as well as by publication to a resident of the State, is relied upon, it is *prima facie* valid. In such case the judgment cannot be said to have been rendered without jurisdiction over the defendant."

While it is true that the court held the proceeding by scire facias to be a continuation of the old suit, the language of the court recognizes the necessity of the two elements, residence and proper notice, contended for by appellant, and in the discussion of the statute as applied to citizens of other States, says that there is the same necessity for personal service and personal jurisdiction to revive the judgment that exists in any other proceeding *in personam.*

In *Federal Trust Co. v. Allen,* 110 Kan. 484, the insane person, domiciled in Nebraska, was taken to Kansas where she remained. Thereafter her daughters applied to the Nebraska court to have their mother adjudged incompetent and for the appointment of a guardian. The plaintiff was appointed and service was had upon the mother by publication and a certified copy of the summons mailed to her in Kansas. The stepson, who had removed the mother to Kansas, was appointed guardian by the Kansas court on the same day as the plaintiff was named in Nebraska. Plaintiff brought action in Kansas claiming the right to the custody of the incompetent by virtue of the Nebraska court's appointment. The Kansas court found that the ward had been continuously domiciled in Nebraska and recognized the Nebraska jurisdiction, saying:

"In this State it has been held that the jurisdiction for the appointment of a guardian of a minor is in the county of the minor's domicile in the absence of any express statute upon that question. *Connell v. Moore,* 70 Kan. 88, 78 Pac. 164, 109 Am. St. Rep. 408. And in *Foran v. Healy,* 73 Kan. 633, 85 Pac. 751, 86 Pac. 470, it was held that the jurisdiction to appoint a guardian over the person and estate of a lunatic belongs exclusively to the probate court of the county where such lunatic has a permanent residence. By analogy there is every reason to hold that the jurisdiction to appoint a permanent guardian over the person

and estate of a lunatic belongs exclusively to the courts of the State where such lunatic has a permanent residence.

. . . . . .

"It follows that the county court of Lancaster county, Neb., had jurisdiction to appoint the petitioner as guardian, and that the petitioner is entitled to the custody of the person of Emily J. Weston."

In *In re Hendrickson,* 40 S. D. 211, proceedings were instituted against an incompetent domiciled in South Dakota, alleged to be the owner of property in the State, and asking for the appointment of a guardian of her person and estate. The incompetent left the State in order to avoid service. A second citation was served upon her in Minnesota, where she attacked the jurisdiction. The lower court quashed the service, relying partly on *Raher v. Raher, supra.* The reviewing court reversed this decision and said:

"Since the opinion in the *Raher* case the Supreme Court of Texas has given this matter just as thorough consideration as did the learned Justice McClain in the *Raher* case, and has arrived at the opposite result in the case of *Mabee v. McDonald,* 107 Tex. 139, 175 S. W. 676, basing its decision largely upon the principle of the amenability of the citizen of a State to its laws and upon the right of a State to provide by statute for the character of the service of process that may be made upon an absent citizen, in which view we concur.

. . . . . .

"It must be conceded, under the statutes above referred to, and under the great weight of judicial authority, that, if the citation had been served by leaving a copy at the Salmonson home in Brookings county with the proper member of the family, no question could have been successfully raised as to the character of the service."

The case of *Mabee v. McDonald,* as heretofore mentioned, was later reversed by the Supreme Court of the United States upon the ground that the manner of publication was insufficient to bind the defendant, but the court in the *Hendrickson* case relied on the *Mabee* case as authority for holding ''the amenability of the citizen of a State to its laws and the right of a State to provide by statute for the character of service of process that may be made upon an absent citizen.'' After quoting with approval from the discussion of the *Raher* case by the annotator in 35 L. R. A. (N. S.) 296, the court in the *Hendrickson* case concluded as follows:

''We therefore conclude that under our laws which do not violate the principles of due process of law in so far as absent citizens of this State are concerned, the county court of Hamlin county acquired jurisdiction over the person of the alleged incompetent by the service of the citation upon her in the State of Minnesota.''

Personal judgments were sustained in the following cases upon constructive service, because the defendants were citizens of or domiciled within the State. We quote briefly from these cases:

*Henderson v. Staniford,* 105 Mass. 504:

''The defendant was not in California when the action was commenced against him there; nor at any time during its pendency. No service of process or notice was ever made upon him personally. He did not appear by counsel, or otherwise, nor assent to the judgment, which was rendered upon his default of appearance. But he had been, for a long time before that, a citizen of California; the contract was made there; and that continued to be his legal domicil when the judgment was rendered. He was therefore, upon principles of international right, subject to the laws, and to the jurisdiction of the courts of that State.

Story Confl. Laws, §§ 546, 548. *Hall v. Williams,* 6 Pick. 232, 240. *Gillespie v. Commercial Insurance Co.,* 12 Gray 201.''

*Nichols v. Howell,* 190 N. Y. S. 1: ''We are all, of course, in agreement that, if Ira A. Howell was a non-resident of the State of New York, the judgment was without validity. The claimant Armstrong takes the position that he was a resident.

. . . . . . .

''The position, therefore, of the two claimants opposing the confirmation of the report predicated upon the alleged nonresidence of defendant Howell is untenable. For the purposes of this motion said defendant must be deemed to be what both of said claimants have described him to be—a resident absent from the State. It follows that the judgment in favor of claimant Armstrong is a valid judgment since it was not necessary to levy an attachment.''

*Roberts v. Roberts,* 135 Minn. 397: ''What is the law when the service is by publication against a resident defendant who is in fact within the State, but cannot be found therein because he conceals himself so that personal service cannot be made? . . . There is nothing in any case in this State that denies that such a service (publication) is due process of law and confers jurisdiction in an action *in personam,* or to render a personal judgment in an action *in rem.* It seems to us that statutes authorizing service by publication in such cases are well within the power of the State to legislate as to its own citizens, and that, on principle and the weight of authority, a duly authorized service by publication on a defendant in a divorce action who is a resident of and within the State, but cannot be found therein because he conceals himself to avoid the service of process, confers jurisdiction to render a personal judgment for alimony. The exact question is discussed at length in the note to *Raher v.*

*Raher* (Iowa), 35 L. R. A. (N. S.) 292, where the cases are cited and discussed, with a conclusion in accord with that we have here reached.''

Since the decision by the Supreme Court of the United States in *Mabee v. McDonald,* holding that service by publication alone is insufficient, additional requirements for notifying the defendants would be necessary under the present state of the law, but these decisions represent the opinion of various courts that the citizenship or domicile of a party justified constructive service to enter personal judgments.

It is conceded, of course, that personal service can be made upon a defendant by leaving a summons at his usual place of abode with a person of the age of 10 years or upwards, even though the defendant may be absent in a foreign land and be entirely ignorant of the pendency of the suit. The logic of the situation would require a domiciled defendant who is absent in an adjoining State and is served by publication and mailing to be equally bound and the reasoning which holds that he has been served with due process in the one case should likewise be applicable to the other, and we believe the court in *Nelson v. Chicago, B. & Q. R. Co.,* 225 Ill. 197, recognized this doctrine when it said:

''The law provides for two methods of service of process: the one actual and the other constructive. Actual service of process is made by reading the original process to the defendant or by delivering to him a copy thereof; and constructive service of process, which is a substituted service of process, is made by leaving a copy of the process at the defendant's residence when he is absent, or by posting or publishing notice of the pendency of the suit and mailing a copy of the notice posted or published to the defendant, if his post-office address is known.''

We have examined the numerous cases cited by appellees with a view of determining whether there

exists in any of the citations a concurrence of the fact of domicile, residence or citizenship together with service that would be reasonably calculated to give the defendant notice. With the exception of the *Raher* and *De La Montanya* cases, however, we find that one of these elements is absent in every case cited. In some of the decisions the defendants were neither domiciled nor resident within the State, in others the method of service was either defective or no service whatsoever was had and in a number of other cases there was neither domicile nor proper service to authorize the exercise of jurisdiction. We are therefore led to the same conclusion as Mr. Justice McClain in the *Raher* case ''that we have found no case in which it has been specifically held, under pertinent facts, that a personal judgment against a resident, who is actually served with notice outside of the territorial limits of the State, is void.'' On the other hand, we find abundant authority, both in Illinois and other States expressly recognizing the doctrine that the citizen owes the State obedience to its laws in return for the obligation of the State to protect him, as *parens patriae,* when he becomes infirm either because of his minority or incompetency, and to fix his status even though he be absent from the State, and that under such circumstances the State may prescribe a method of constructive service by which its courts will exercise jurisdiction over him which, if reasonably calculated to give the absent citizen notice, does not constitute a violation of the constitutional guarantee of due process of law. Therefore, whether this be technically considered a proceeding *in personam* or *in rem,* we are led to the conclusion that under the provisions of the Chancery Act, when properly employed as they were in this case both as to publication and mailing, the probate court had jurisdiction to appoint a conservator of the person of Stanley McCormick as well as of his estate.

The remaining contention is that the appointment of conservators of the person would be a violation of the respect due to the court of California and of the full faith and credit clause of the Constitution of the United States. We find that comity is not a rule of law but one of practice and convenience, as was stated in *Mast, Foos & Co. v. Stover Mfg. Co.,* 177 U. S. 485:

"Comity is not a rule of law, but one of practice, convenience and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question. But its obligation is not imperative. . . . Comity persuades; but it does not command. It declares, not how a case shall be decided, but how it may with propriety be decided."

The appointment of a personal conservator by the California court was based on the police power of the State exercised over a nonresident incompetent temporarily within its borders. Since comity is a rule of convenience and expediency, it should be employed to promote rather than to defeat justice and because, as the probate court found "it would be to the best interests of Stanley McCormick to have this court, being the court of his domicile, have charge of his person as well as his property," we believe the rule should be determined in favor of the conservatorship under the jurisdiction of the probate court of this county. Moreover, we regard it as the settled doctrine of the law that only the State of the ward's domicile can create the *status* of guardian and ward which is entitled to be respected in other jurisdictions. *Federal Trust Co. v. Allen, supra,* and recognition of this rule in the Restatement of Conflict of Laws, *supra,* secs. 152, 153 and 154.

For the foregoing reasons the judgment of the circuit court will be reversed and remanded with instructions to proceed further in accordance with the views herein expressed.

*Reversed and remanded.*

WILSON, P. J., and HEBEL, J., concur.